(70 South. 212)

No. 21454.

LE BLANC et al. v. CITY OF NEW ORLEANS.

In re CITY OF NEW ORLEANS.

(June 28, 1915. Rehearing Denied Nov. 29, 1915.)

*(Syllabus by the Court.)*

1. COURTS ⬡95 — EQUITY ⬡1 — "EQUITY SYSTEM"—JURISDICTION—PRECEDENTS FROM OTHER STATES.

The present system known as "equity" is the result of a struggle between the courts of countries of unwritten law, and its principles and precedents, established by its courts, are applied, not only to remedy the deficiencies of, but, at times, to overlap, and to prevail against, the law. Louisiana has always been a country of written (civil) law. Its Constitutions have always contained the prohibition, directed especially against the common-law and equity systems, "The Legislature shall never adopt any system or code of laws, * * * but in all cases shall specify the several provisions of the laws it may enact"; and its Legislatures have conferred no other equity jurisdiction upon its judges than as contained in the provision which reads, "In civil matters, where there is no express law, the judge is bound to proceed according to equity. To proceed equitably, an appeal is to be made to natural law and reason, or received usages, when positive is silent." Civ. Code, art. 21.

The ordinary measure of the jurisdiction of Louisiana courts, sitting in equity, has therefore never been the measure by which the jurisdiction of courts of equity in general is determined, but has been, and is, neither greater nor less than as declared in the written law by which it is conferred; hence the precedents established by chancellors, administering a system forbidden in this state, not of law, but of jurisprudence, must be here considered with respectful caution.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 322, 323; Dec. Dig. ⬡95; Equity, Cent. Dig. §§ 1, 3, 6; Dec. Dig. ⬡1.]

2. COURTS ⬡95 — INJUNCTION ⬡105—MUNICIPAL CORPORATIONS ⬡636—VIOLATION OF ORDINANCES—PROSECUTION — JURISDICTION.

The Constitution and statutes of Louisiana confer all jurisdiction, original, appellate, and supervisory, with respect to prosecutions under penal ordinances of the city of New Orleans, upon the recorders' courts, the criminal district court, and the Supreme Court, and confer jurisdiction on the civil district court only as to controversies affecting civil and property rights. But cases arise where the respective jurisdictions appear to conflict, and the law appears to be silent as to the line between them, as where prosecutions under such ordinances alleged to be unconstitutional or illegal are said to operate as invasions of property rights, and in such cases the judge of the civil district court, being bound to decide according to equity, as defined by article 21 of the Civil Code, may be aided by the precedents of the courts of equity elsewhere established, according to which he may grant an injunction to restrain a prosecution, or threatened prosecution, under an illegal ordinance, until the alleged invasion of property rights is inquired into. But in such case no injunction should be granted unless there be found three concurring conditions, to wit, the invasion of a property right must be clearly shown, the unconstitutionality or illegality of the ordinance must be manifest, and the judge must be satisfied that the applicant is threatened with irreparable injury, against which the law, as ad-

ministered in the courts vested with jurisdiction of the prosecution, affords no adequate remedy. If either of these conditions is lacking, the civil district court is without jurisdiction to issue the writ.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 322, 323; Dec. Dig. ☞95; Injunction, Cent. Dig. §§ 178, 179; Dec. Dig. ☞105; Municipal Corporations, Cent. Dig. § 1402; Dec. Dig. ☞636.]

3. MUNICIPAL CORPORATIONS ☞661, 682— USE OF STREETS — CONDITIONS OF GRANT — RIGHTS OF INDIVIDUAL.

The streets of the cities and towns in Louisiana being among the things that are "public" and "for the common use," no individual can have a property right in such use for the purposes of his private business, unless (generally speaking), that business being in the nature of a public service, utility, or convenience, such as would authorize the grant, the right has been granted by the state, which alone has the power to make or authorize it, or by the particular city or town to which that power has been delegated, and in such case the power can be exercised only in accordance with the conditions of the grant; that is to say, an individual, seeking, but not possessing, a grant of that kind, may accept the grant, with the conditions imposed by the offer, in which case he becomes bound by the conditions, or he may refuse to accept the conditions, in which case there is no grant; but without the grant so offered, or some other grant, he can never acquire the right to make the street his place of business and its use the main instrumentality in the conduct of that business. Whether, under any circumstances, an individual can compel a municipal corporation to make a grant of such right, with conditions satisfactory to himself, and unsatisfactory to the corporation, is a question that is not involved in this inquiry.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1432, 1434–1436, 1467–1470; Dec. Dig. ☞661, 682.]

4. MUNICIPAL CORPORATIONS ☞661—USE OF STREETS — ORDINANCE—INVASION OF PROPERTY RIGHTS—INJUNCTION.

The legislative charter of the city of New Orleans specifies certain businesses and matters of contract for the purposes of which the city may grant the use of the streets, but the business in which plaintiffs are engaged is not among them. That business consists of the carrying of passengers for fares, in vehicles, called "jitneys," and plaintiffs complain that their "constitutional right" to use the streets of New Orleans for its purposes is invaded by a penal ordinance imposing conditions that are arbitrary and unreasonable, and with which they are unable to comply. But the complaint rests upon an erroneous conclusion of law, since the Constitution confers no such right, and, on the other hand, that instrument and the law vest the power to regulate the use of the streets for the benefit of the public in the electors of the city of New

Orleans and the public officers chosen by them. Plaintiffs' complaint, therefore, discloses no property right which is threatened with invasion, and no interest in the operation of the ordinance complained of which gives him a standing in court to attack it or obstruct it. Hence it is immaterial for the purposes of this suit whether the law, as administered in the courts vested with jurisdiction of prosecutions under said ordinance, affords an adequate remedy for the protection of such interest, or whether the ordinance be valid or invalid; and hence, also, the civil district court was without jurisdiction to grant the injunction.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1432, 1434–1436; Dec. Dig. ☞661.]

Injunction by Hoa Le Blanc and others against the City of New Orleans. Injunction granted, and the City applies for a writ of prohibition. Writ of prohibition granted.

John J. Reilley, Asst. City Atty., and I. D. Moore, City Atty., both of New Orleans, for applicant. C. C. Friedrichs and Harold A. Moise, both of New Orleans, for respondents Le Blanc and others. Edgar M. Cahn and Nathan Feitel, both of New Orleans, for respondent New Orleans Motor Car Ass'n. Farrar, Jonas, Goldsborough & Goldberg and Buck, Walshe & Buck, all of New Orleans, amici curiæ.

MONROE, C. J. The city of New Orleans adopted—

"an ordinance [No. 2346, Commission Council Series] regulating the business of carrying passengers for fares in vehicles not operated on rails, and providing for the giving of an indemnity bond by all persons engaged in the business of transporting passengers over indicated routes and for a uniform fare in all vehicles whether operated exclusively on rails or otherwise."

By reason of its application to the litigants herein, and for the purposes of this case, it has been called the "jitney ordinance," and its first section contains provisions requiring the registry of the vehicles to which it refers, the painting thereon of the names and addresses of those using them in the business, the carrying of signs showing the routes traveled and fares charged, and of

lights at night, requiring them to receive and discharge passengers at certain places, etc. The second section reads as follows:

"Be it further ordained, etc., that no person, firm, association of persons, or corporation, shall be permitted to conduct and carry on the business of transporting passengers on indicated routes and for a uniform fare, whether the said transportation is in vehicles not operated on rails or in vehicles operated on rails, or otherwise, or be permitted to use and employ in the conduct and carrying on of such business any such vehicle until he shall have first filed with the commissioner of public safety of New Orleans an indemnity bond in the sum of five thousand dollars for each and every such vehicle so used and employed; the said indemnity bond or bonds to be executed by a surety company or companies duly authorized to do business in the state of Louisiana, payable to the city of New Orleans, and shall contain stipulation that, in the event any person or persons who may sustain damages to his or their person or property as the result of the fault of the person, firm, association of persons or corporation conducting said business, or of his or their agents, servants, or employés, he or they shall have his or their right of action on said indemnity bond as fully and to the same extent as if said bond was made and executed directly in favor of the claimant for such damages. · The said indemnity bond or bonds shall be submitted and shall first be approved by the commission council. The amount of said bond (to wit, $5,000 for each vehicle operated as aforesaid) shall always be maintained at that figure, and shall not be void upon first recovery, but shall be actional [actionable] against from time to time until the full amount thereof is exhausted and, in the event that the amount thereof shall have been reduced by payment for damages under the terms of said bond and these provisions, the person, firm, association of persons or corporation conducting the business of carriers of passengers aforesaid shall furnish an additional bond for the amount so paid, so that, at all times, a bond or bonds of indemnity for the entire sum of five thousand· dollars shall be carried on each and every vehicle used, employed and operated in the business aforesaid: Provided, however, that the provisions of this section shall be operative from· and after the 15th day of May, 1915."

The plaintiffs herein (Le Blanc and Geerken) filed a petition in the civil district court for the parish of Orleans, alleging that they are "engaged in a legitimate business in the City of New Orleans, to wit, the transportation of passengers for fare; that they have paid their state and city licenses for such a business"; that petitioner Le Blanc has been charged, in the First recorder's court, with violating the section above quoted, and has attacked the ordinance by demurring to the affidavit, on the ground that said section is "unconstitutional, arbitrary, discriminatory, unreasonable, confiscatory, illegal, null, and void"; that the condition thereby imposed is impossible of fulfillment, for the reason that "petitioners are unable to furnish collateral security to indemnify a bond company up to the extent of $5,000 for each car operated"; that the insurance companies will not change their form of contract to meet the requirements of the ordinance; that the requirement of an indemnity bond is not in the nature of a police regulation, is ultra vires of the city, and an unwarranted interference with petitioner's constitutional right to engage in legitimate business and to use and enjoy their property; that the financial condition of the city and the law protecting it from executions on ordinary judgments render it impossible that petitioners should obtain compensation in damages; that they have no adequate remedy at law; and that the injury that they will sustain will be irreparable, unless the city is restrained by injunction from enforcing said ordinance, while the question of its legality and constitutionality is pending before the courts of this state. Wherefore they prayed for a preliminary injunction restraining the city from enforcing the ordinance, and from interfering with them in their business, and that, after due proceedings, the writ be perpetuated. A copy of the demurrer filed in the recorder's court is annexed to the petition, and shows that the objections relied on in that court were the same as those set up in the petition for injunction. The city filed an exception to the jurisdiction of the civil district court and of no cause of action, alleging that the ordinance was adopted in the exercise of power vested in it by its legislative charter (Act No. 159 of 1912), upon a

subject falling within the domain of its police power, and that jurisdiction of complaints arising from its enforcement is vested in the recorders, which exception having been overruled, the injunction was issued as prayed for, and the matter is now before this court upon the city's application for prohibition and the return thereto of the judge a quo, to whom an order to show cause and a restraining order were directed by this court.

### Opinion.

[1, 2] The question to be considered is whether the civil district court had jurisdiction to grant the injunction.

The Constitution of the state contains the following provisions relevant to that inquiry, to wit:

Art. 132. Declaring that there shall be two district courts for the parish of Orleans, the "civil district court" and "the criminal district court."

"Art. 133. The civil district court shall have exclusive and general original probate jurisdiction, and exclusive original civil jurisdiction, in all cases where [enumerating various classes of civil cases]; and said court shall have authority to issue all such writs, process and orders as may be necessary or proper for the purpose of the jurisdiction herein conferred upon it."

"Art. 139. The criminal district court shall have exclusive original jurisdiction for the trial and punishment of all offenses when [enumerating certain classes of criminal cases] and appellate jurisdiction in all cases tried before the city criminal courts, or recorders' courts of New Orleans. * * * Said court shall have general criminal jurisdiction extending to all cases arising in the parish of Orleans, the jurisdiction of which is not vested by law or by this Constitution in some other court. Said court shall have general and supervisory jurisdiction over all inferior state and municipal criminal courts in the parish of Orleans, and shall have authority to issue writs of habeas corpus, in criminal and quasi criminal cases, and such other writs and orders as may be necessary and proper in aid of the jurisdiction conferred upon it. * * *"

"Art. 141. The General Assembly shall provide for recorders' courts in the city of New Orleans, to be presided over by magistrates, who need not be attorneys at law, but such courts shall have no jurisdiction except for the trial of offenses against city ordinances."

"Art. 85. The Supreme Court, except as hereinafter provided, shall have appellate jurisdiction only, which jurisdiction shall extend to * * * all cases in which the constitutionality or legality of any * * * fine, forfeiture, or penalty imposed by a municipal corporation, shall be in contestation," etc.

"Art. 94. The Supreme Court shall have control and general supervision over all inferior courts. The court, or any justice thereof, shall have power to issue writs of certiorari, * * * mandamus, quo warranto, and other remedial writs."

Act No. 159 of 1912, being the legislative charter of the city of New Orleans (whereby the present "commission" form of government was established), contains the following, among other, provisions, to wit:

"Sec. 21. There shall be not less than three police courts in the city of New Orleans, to be known as * * * recorders' courts."

"Sec. 25. Recorders shall have power to enforce all valid city ordinances, and to try, sentence and punish all persons who violate same."

The provisions of the act bearing upon the question of the power of the city to control and regulate the use of the streets are, in part, as follows:

"Section 1. * * * (e) The city shall also have all powers, privileges and functions, which, by or pursuant to the Constitution of this state, have been, or could be, granted to, or exercised by any city."

"Sec. 6. The commission council shall have the power, and it shall be their duty, to pass such ordinances, and to see to their faithful execution, as may be necessary and proper: * * *

"3. To open and keep open and free from obstruction all streets. * * *

"4. To keep the streets * * * clean and in repair. * * *

"6. To light the streets. * * *"

"Sec. 8. The commission council shall also have power:

"1. To order the ditching, filling, opening, widening and paving of the public streets, and to regulate the grade thereof, and, by a two-thirds vote, to sell or change the destination of any street or property which is no longer necessary for the public use to which it was originally destined, and which is needed for public buildings * * * owned by the United States, the state of Louisiana or the city of New Orleans, or for the establishment of a railway union depot. * * *

"12. To authorize the use of the streets for railroads operated by horse, electricity, steam or motive power, and to regulate the same. * * *"

"Sec. 28. Every ordinance purporting to grant to any person, corporation, association or

firm any privilege to use or occupy any part of any street, public place or public property in connection with the conduct of any private business, shall, after having been introduced in the commission council, be advertised in full in the official journal daily for two weeks, and shall then be considered and passed or rejected * * * in the manner provided for other ordinances. No privilege of any kind for the use of any part of any street, public place or public property in connection with the conduct of any private business, except such as are incidental, appertaining to or necessarily connected with grants of the character referred to in Sec. 29, now existing or hereafter to be made, shall be granted by the commission council except on adequate consideration fixed in the ordinance granting the privilege payable, at the discretion of the * * * council, either in cash before said privilege is exercised, or in installments to be paid in advance at dates to be fixed by the ordinance."

The grants referred to in section 29 are.

"The lighting of streets or public places, the lease of public markets or * * * other utilities to become public on terms, the operation of ferries, the removal or disposal of garbage, the constructions and operations of street railroads or purporting to award a contract covering the performance or discharge of any public duty or function. * * * "

The Civil Code declares that public things are those the property of which is vested in the whole nation, and the use of which is allowed to all the members of the nation; that navigable rivers, seaports, roadsteads, and harbors, highways and the beds of rivers, as long as the same are covered by water, are public things; that streets and public squares are for the common use of a city or other place; that every man has the right freely to fish in the rivers, ports, roadsteads, and harbors (C. C. arts. 453, 454); from which it follows, by a parity of reasoning, that every man has a right freely to use the streets. But, if the fishing in the rivers and harbors and the use of the streets is monopolized by the few for the purposes of private business, the many are deprived of the free fishing and the use to which they also are entitled; hence the state regulates the matter, so that each individual may get his share of that which should be common to all, and each may be restrained from so using and enjoying the

common right as to preclude a like use and enjoyment by the others; and, so far as the streets of the city of New Orleans are concerned, the power to enact and enforce such regulation is vested, as we have seen, in the subordinate branch of the state government known as the commission council of the city of New Orleans which has been created with due regard to article 319 of the Constitution, reading in part:

"Art. 319. The electors of the city of New Orleans and of any political corporation which may be established within the territory now, or which may hereafter be embraced within the corporate limits of said city, shall have the right to choose the public officers, who shall be charged with the exercise of the police power and with the administration of the affairs of said corporation in whole or in part."

The commission council (composed of the "public officers" so required to be chosen, and so chosen), in the exercise of the power and discretion so vested in it by Constitution and statute—to administer the streets of New Orleans and regulate their use for the greater convenience and safety of all who are entitled to such use—enacted the ordinance in question, and, while seeking to enforce it, in a tribunal authorized by the Constitution, created by statute, and vested with exclusive original jurisdiction in the premises, is enjoined by the civil district court from so doing. No one pretends that the law of their creation authorizes that court to enjoin the recorder from entertaining a prosecution under the ordinance, or to dictate to him the interpretation that he shall place upon it for the purposes of such prosecution, or the judgment that he shall render. No one pretends that the recorder is incapable of discharging the duties imposed upon him, or that the criminal district court, specially vested by the Constitution with appellate and supervisory jurisdiction to review the judgments of the recorder and to issue all writs necessary and proper in aid of that jurisdiction, is any less competent to discharge that

function than the civil district court, upon which no such jurisdiction is conferred.

And no one pretends that the appellate jurisdiction of this court may not be as successfully invoked for the determination of the question of the constitutionality or legality of a fine or penalty imposed by a municipal corporation in a case appealed from the recorder's court as in one appealed from the civil district court. It is contended, however, that the jurisdiction of the recorder can be ousted by indirection; that is to say, that the commission council can be enjoined from prosecuting, under the ordinance in the recorder's court until the civil district court shall have determined whether the ordinance is constitutional and legal, and perpetually enjoined, should that question be decided in the negative. The theory which underlies the contention is thus expressed in the return of our learned brother of the civil district court, to wit:

"(4) That the civil district court is a court of equity, as well as a court of law, and it has unquestioned jurisdiction to restrain the enforcement of a municipal ordinance which carries with it a penalty, when it is properly set out that property rights are menaced by such an arbitrary enactment.

"(5) That the recorders' courts of the city of New Orleans have no power to determine civil rights and obligations; neither is there any provision under the law wherein the recorders' courts are given simultaneous and concurrent jurisdiction with the civil district court."

Authority for the statement that "the civil district court is a court of equity" is said to be found in article 21 of the Civil Code, which declares that:

"In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

Authority for the issuance of the writ of injunction is thought to be conferred by so much of the following language of the Code of Practice as we italicize, to wit:

"Art. 303. Besides the cases above mentioned [referring to certain specified cases mentioned in articles 298 et seq.], courts of justice may grant injunctions in all other cases when it is necessary to preserve the property in dispute during the pendency of the action, and to prevent one of the parties, during the continuance of the suit, from dilapidating the same, *or from doing some other act injurious to the other party.* * * *"

Article 303, it may be stated, is contained in part 2 of the Code of Practice, the title of which reads:

"Part II—Containing Rules to be Observed in the Prosecution of Civil Actions."

It will be seen from the foregoing that the civil district court is a court of purely civil jurisdiction, and that the quasi criminal jurisdiction required for the determination, in first instance and last resort, of all questions arising under penal ordinances adopted by the city of New Orleans, is specifically vested in the recorders' courts, the criminal district court, and the Supreme Court.

It is said, however, that because the civil district court is a court of "equity" (as we understand the arguments and the appeals to the decisions of the Supreme Court of the United States and of the other states of the Union), it has what is said to be the "unquestioned jurisdiction [of any court in England or this country where the English equity system or its derivative is administered] to restrain the enforcement of a municipal ordinance which carries with it a penalty, when it is properly set out that property rights are menaced," and is alleged that the ordinance is unconstitutional or illegal; in other words (according to the argument), though the state of Louisiana, which created the civil district court and limited its jurisdiction in specific terms to civil matters, also created the city of New Orleans, imposed upon it the governmental function and duty of legislating with reference to, and prosecuting for the commission of, certain classes of minor offenses, and specifically vested in other courts all jurisdiction, original, appellate, and supervisory, for the enforcement of that legislation,

the civil district court may, nevertheless, because such things have been done (or are said to have been done) by the Lord Chancellor of England and the judges of the United States courts and of the courts of the common-law states sitting in equity, make its order that there shall be no such prosecution in any case where the person charged with offending against an ordinance so enacted by the city shall assert that his property rights are thereby threatened, until it (the civil district court) shall first have determined that the ordinance is valid, and that the prosecution should be sustained. The idea thus expressed is predicated, as we think, upon a total misapprehension of the relation which is assumed to subsist between the "equity system" as administered in England and in the common-law states of this country and the limited equity jurisdiction which is conferred by the five lines of article 21 of the Civil Code upon the courts of this state. That "system" is the result of some hundreds of years of struggle and controversy between the courts of countries where the body of the law was unwritten, and where the principles of the common law, of equity, and of the law merchant were alike established by the decisions of those courts.

"As the term is used in American cases and texts," says a late well-known author, "equity is that portion of remedial justice which was formerly administered in England by the High Court of Chancery by virtue of its extraordinary jurisdiction, as extended, limited, and modified by statute, and adapted to our conditions by judicial construction. * * * "After many struggles with the law judges, notable among which is that led on the one side by Lord Ellesmere, and on the other by Sir Edward Coke, the independent, and for some purposes superior, authority of chancery, as a distinct court, administering independent remedies by its own procedure, became thoroughly established. Later Chancellors developed, through this jurisdiction, a system of rules, principles, procedure, and remedies, which together form what we know as 'equity.' Equity is therefore now a separate, but incomplete, system of jurisprudence, administered side by side with the common law, supplementing the latter where it is deficient in places, overlapping, and there usually prevailing as against, law. The

lay notion of equity," says the author, in a note, "is that its purpose is to administer natural justice in the particular case without regard to fixed or general rules, and, indeed, to set aside rules of law when essential to do so to the ends of natural justice. Such was undoubtedly the principle guiding the early Chancellors. Such a state of affairs inevitably led to the condition depicted by the well-known statement of Selden that: 'Equity is a roguish thing. For law we have a measure, and know what to trust to. Equity is according to the conscience of him that is Chancellor, and, as that is larger or narrower, so is equity. 'Tis all one as if they should make his foot the standard of the measure we call a Chancellor's foot. What an uncertain measure would this be. One Chancellor has a long foot, and the other a short foot, a third an indifferent foot.' 'Tis the same thing in the Chancellor's conscience. Table Talk Eq. The modern theory follows that of Lord Eldon: 'The doctrines of this court ought to be as well settled, and made as uniform almost as those of the common law, laying down fixed principles, but taking care that they are not to be applied according to the circumstances of each case.' Gee v. Pritchard, 2 Swanst. 402, 414, 9 Rev. Rep. 87, 36 Eng. Reprint, 670. 'The principles are as fixed and certain as the principles in which the courts of common law proceed.' Bond v. Hopkins, 1 Sch. & Lef. 413. 'Equity is not the Chancellor's sense of moral right, or his sense of what is just and equal. It is a complex system of established law.' Savings Inst. v. Makin, 23 Me. 360, 366." 16 Cyc. pp. 1, 2, note 5 (Frank Irvine).

The state of Louisiana has never been governed by unwritten law, save in so far as that the common-law definitions of certain enumerated crimes, and its rules of procedure in the prosecution of crimes, offenses, and misdemeanors were adopted prior to the adoption of the first Constitution, and no system has ever been here established which has, or could have, overlapped, prevailed against, or acquired an authority superior to that of, our written law, as contained in Constitutions, Codes, and statutes.

If, when the state was admitted into the Union, the inhabitants had preferred the systems of common law and equity which had been adopted by the other states, they, too, would, no doubt, have adopted them. But, instead of so doing, they incorporated in the first state Constitution (adopted in 1812) the provision and prohibition (article 4):

"Sec. 11. The existing laws in this territory, when this Constitution goes into effect, shall continue to be in force until altered or abolished by the Legislature: Provided, however, that the Legislature shall never adopt any system or code of laws by a general reference to the said system or Code, but in all cases shall specify the several provisions of the laws it may enact."

What the Legislature did (after some years) with reference to equity was, not to adopt the system as it then existed elsewhere (whether it was capable of overriding the law, according to the conscience of the chancellor and the exigencies of the particular case, or according to fixed principles applicable to all cases alike), but to declare that:

"*In civil matters, where there is no express law*, the judge is bound to proceed `* * *` according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, *where positive law is silent.*" Civ. Code, art. 21.

Since 1812 there have been seven Constitutions adopted in Louisiana, exclusive of that with which she became a state, and inclusive of one which is not yet two years old, and each has contained the same original prohibition against the adoption of "any system of laws" especially directed, as is well known historically, against the "common-law" and "equity" systems established in the other states. The ordinary measure of the jurisdiction of our courts, sitting in equity (if such an expression can be used), has therefore never been, and is not now, the measure by which the jurisdiction of chancery courts in general is determined, but has been, and is, and must be, neither greater nor less than as fixed in the written grant whereby it has been, and is now, conferred; and the precedents established by chancellors who are administering a system thus prohibited in this state, not of law, but of jurisprudence, which still prevails against the law, and still remains, and will ever remain, incomplete, must, in the nature of things, be considered with respectful caution by courts which ad-

138 LA.—9

minister written law, and can appeal to equity (defined to be "natural law and reason or received usages") only when the written law is silent. Nevertheless, as the same Constitution and laws which confer jurisdiction upon the recorders with respect to prosecutions under the penal ordinances of the city of New Orleans also confer upon the civil district court jurisdiction for the assertion and protection of property rights, and as our law fails to establish in terms for all cases, or indeed for any case, the line which should separate and distinguish those jurisdictions, the rulings of the courts administering the prohibited systems are likely to aid us in determining the "natural law and reason" which should be applied in a case involving that issue, and we shall therefore endeavor to ascertain what those rulings have been by considering a few of the leading cases.

In Ex parte Sawyer, 124 U. S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402, it appears that A. F. Parsons, demanding equal protection of the laws and protection against the invasion without due process of law of his rights to the enjoyment of life, liberty, and property, obtained from the Circuit Court of the United States, sitting in equity, a writ of injunction prohibiting the mayor and certain members of the council of the city of Lincoln (Neb.) from proceeding to try him under an ordinance which he alleged to be ex post facto and illegal, upon certain charges of malfeasance in the office of police judge. It further appears that the defendants in injunction ignored the writ; that they were summoned before the court for contempt and lodged in jail; and that they applied to the Supreme Court for release by habeas corpus. The sole question considered was that of the jurisdiction vel non of the circuit court to grant the injunction, and in deciding it the Supreme Court, through Mr. Justice Gray, took occasion to state generally and specifically its views concerning the jurisdiction of equity, as established in the

United States and in England, to interfere with the enforcement of criminal and quasi criminal laws and ordinances; and, as the case has since then been cited by the Supreme Court as authority, and is regarded as a leading case upon the question decided, we quote somewhat in extenso from the opinion, as indicating the views of the federal judiciary upon that question, to wit:

"Mr. Justice Gray. * * * The question presented by this petition * * * is whether it was within the jurisdiction and authority of the Circuit Court of the United States, sitting as a court of equity, to make the order under which the petitioners are held by the marshal. Under the Constitution and laws of the United States, the distinction between common law and equity, as existing in England at the time of the separation of the two countries, has been maintained, although both jurisdictions are vested in the same courts. [Authorities.] The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, the punishment, or the pardon of crimes or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government. Any jurisdiction over criminal matters that the English court ever had became obsolete long ago, except as incidental to its peculiar jurisdiction for the protection of infants, or under its authority to issue writs of habeas corpus for the discharge of persons unlawfully imprisoned. [Authorities.] From long before the Declaration of Independence it has been settled in England that a bill to stay criminal proceedings is not within the jurisdiction of the Court of Chancery, whether those proceedings are by indictment or by summary process. Lord Chief Justice Holt, in declining, upon a motion in the Queen's Bench for an attachment against an attorney for professional misconduct, to make it a part of the rule to show * * * that he should not move for an injunction in chancery in the meantime, said: 'Sure, chancery would not grant an injunction in a criminal case under examination in this court; and if they did, this court would break it, and protect any one who would proceed in contempt of it.' [Authority.]

"Lord Chancellor Hardwicke, while exercising the power of the Court of Chancery, incidental to the disposition of a case pending before it, of restraining the plaintiff, who had by his bill submitted its rights to its determination, from proceeding as to the same matter before another tribunal, either by indictment or by ac-

tion, asserted in the strongest terms the want of any power or jurisdiction to entertain a bill for an injunction to stay criminal proceedings, saying: 'This court has not originally and strictly any restraining power over criminal prosecutions.' And again: 'This court has no jurisdiction to grant an injunction to stay proceedings on a mandamus, nor to an indictment, nor to an information, nor to a writ of prohibition, that I know of.' [Authorities.]

"The modern decisions in England by eminent equity judges concur in holding that a Court of Chancery has no power to restrain criminal proceedings, unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there. [Citing authorities.]

"Mr. Justice Story, in his Commentaries, * * * affirms the same doctrine. Story, Eq. Jur. 893. And in the American courts, so far as we are informed, it has been strictly and uniformly upheld, and has been applied alike whether the prosecutions or arrests sought to be restrained arose under statutes of the state or under municipal ordinances. West v. Mayor of N. Y., 10 Paige [N. Y.] 539; Davis v. Am. Society, etc., 75 N. Y. 362; Tyler v. Hamersley, 44 Conn. 419, 422 [26 Am. Rep. 479]; Stuart v. La Salle Co., 83 Ill. 341 [25 Am. Rep. 397]; Devron v. First Municipality, 4 La. Ann. 11; Levy v. Shreveport, 27 La. Ann. 620; Moses v. Mobile, 52 Ala. 198; Gault v. Wallis, 53 Ga. 675; Phillips v. Stone Mountain, 61 Ga. 386; Cohen v. Goldsboro Com'rs, 77 N. C. 2; Waters-Pierce Oil Co. v. Little Rock, 39 Ark. 412; Spink v. Francis [C. C.] 19 Fed. 670, and [C. C.] 20 Fed. 567; Suess v. Noble [C. C.] 31 Fed. 855."

The court then proceeds to consider the jurisdiction with respect to the appointment and removal of public officers, holding that it belongs exclusively to the courts of law; and the writ of habeas corpus was sustained.

In Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399, it appeared that Wadley had obtained an injunction from the Circuit Court of the United States, sitting in equity, restraining the commonwealth's attorney and special prosecutors from further prosecuting a charge of embezzlement then pending against him in a state court, one of the grounds relied on being that, by appointing a receiver for the bank whose funds were said to have been embezzled, the Circuit Court had first acquired jurisdiction. In the course of the opinion the court cited Ex parte Sawyer as authority, differentiated

Wadley's possible civil liability in the receivership from his alleged criminal liability under the laws of Virginia, referred to Rev. Stat. U. S. § 720 (U. S. Comp. St. 1913, § 1242), whereby it is enacted "that the writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a state except where such injunction may be authorized by any law relating to proceedings in bankruptcy," and, after dealing with other questions presented, stated its conclusions as follows:

"We are of opinion, then, that a court of equity, although having jurisdiction over person and property in a case pending before it, is not thereby vested with jurisdiction over crimes committed in dealing with such property by a party before the civil suit was brought, and cannot restrain by injunction proceedings regularly brought in a criminal court having jurisdiction of the crime and of the accused. Much more are we of opinion that a Circuit Court of the United States, sitting in equity in the administration of civil remedies, has no jurisdiction to stay by injunction proceedings pending in a state court in the name of a state to enforce the criminal laws of such state."

In Fitz v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535, the receiver of a railroad company prayed for an injunction to restrain the Attorney General of Alabama from instituting or prosecuting criminal proceedings under a state law (of 1895) reducing certain bridge tolls, which had been exacted from the public by the company of which the petitioner was receiver. The opinion of the court reads in part:

"We are of opinion that the Circuit Court of the United States, sitting in equity, was without jurisdiction to enjoin the institution or prosecution of these criminal proceedings commenced in the state court. * * * Further, even if the circuit court regarded the act of 1895 [the act reducing the tolls] as repugnant to the Constitution of the United States, the custody of the accused by the state authorities should not have been disturbed by any order of that court, and the accused should have been left to be dealt with by the state court, with the right, after the determination of the case in that court, to prosecute a writ of error from this court for the re-examination of the final judgment so far as it involved any privileges secured to the accused by the Constitution of the United States."

In Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 Sup. Ct. 498, 47 L. Ed. 778, plaintiff applied for an injunction to restrain the enforcement of ordinances prohibiting the construction of gas tanks on certain property, upon the ground that the ordinances were unconstitutional. It appeared that the Valley Gas & Fuel Company had contracted to erect the tanks for Mrs. Dobbins, the owner of the land, who had obtained a permit from the city, but that the city afterwards withdrew the permit, passed the ordinances, and prosecuted the employés of Davis & Farnum Company, who were subcontractors, for their violation. A demurrer was filed and sustained to the effect that:

"A court of chancery has no power to restrain criminal proceedings, unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there."

On the appeal the Supreme Court, dealing with the question of its own jurisdiction, said:

"The state having delegated certain powers to the city, the ordinances of the municipal authorities in this particular are the acts of the state through one of its properly constituted instrumentalities, and their unconstitutionality is the unconstitutionality of a state law, within the meaning of section 5 of the Circuit Court of Appeals Act." U. S. Comp. St. 1913, § 1215.

The question of the jurisdiction of the court a qua to issue the injunction prayed for was disposed of by reference to the opinion in Ex parte Sawyer, supra, as follows:

"That a court of equity has no general power to enjoin or stay criminal proceedings unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there, or to prohibit the invasion of rights of property by the enforcement of an unconstitutional law, was so fully considered and settled in an elaborate opinion by Mr. Justice Gray in Re Sawyer, 124 U. S. 200 [8 Sup. Ct. 482, 31 L. Ed. 402], that no further reference to prior authorities is deemed necessary, and we have little more to do than to consider whether there is anything exceptional in the case under consideration to take it out of the general rule. * * *

"The general rule that a Circuit Court of the United States, sitting as a court of equity, can-

not stay by injunction proceedings pending in a state court to enforce the criminal laws of such state, was applied in Harkrader v. Wadley, * * * to a case where the plaintiff sought to enjoin proceedings against him for the embezzlement of the assets of a bank; and in Fitz v. McGhee * * * to a suit brought by the receiver of a railroad against the Attorney General of the state to restrain him from instituting or prosecuting criminal proceedings to enforce against the plaintiff the provisions of a state law reducing the tolls which had been exacted of the public by the railroad of which the plaintiff was receiver. This was held to be, in reality, a suit against the state to enjoin the institution of criminal proceedings, and, hence within the general rule. * * *
"Plaintiff seeks to maintain its bill under the exception above noted, wherein, *in a few cases*, an injunction has been allowed to issue to restrain an invasion of rights of property by the enforcement of an unconstitutional law, where such enforcement would result in irreparable damages to the plaintiff." (Italics by present writer.)

The court found, however, that the plaintiff then before it, as a subcontractor, had presumably a right of action against the contractor (though, on the case before it, opinion on that point was withheld), and held that plaintiff alleged no such invasion of property rights as to entitle it to the injunction prayed for.

In Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, it was held that Mrs. Dobbins, who was the owner of the property and party to the contract for the erection of gas tanks thereon (referred to in the case last above cited), did disclose such property right as to call for the injunction. The court said:

"In this case we think the allegations of the bill disclose such character of territory, such sudden and unexplained change of its limits after the plaintiff in error had purchased the property and gone forward with the erection of the works, as to bring it within that class of cases wherein the court may restrain the arbitrary and discriminatory exercise of the police power which amounts to a taking of property without due process of law and an impairment of property rights protected by the Fourteenth Amendment to the federal Constitution."

Among many cases similarly decided by the state courts, we find that of Crighton v. Dahmer, 70 Miss. 602, 13 South. 237, 21 L.

R. A. 84, 35 Am. St. Rep. 666, to which we refer, not only as an authority worthy of consideration, but because of the annotation. It is there held by the Supreme Court of Mississippi as follows (quoting syllabus):

"A court of equity cannot grant an injunction against the prosecution of criminal proceedings, even in a case of a criminal prosecution for trespass in which a disputed property right is involved, as to which equity has jurisdiction to afford relief."

In the course of the opinion, Cooper, J., as the organ of the court, said:

"A somewhat extended examination of the approved text-writers and of judicial decisions has disclosed no suggestion among the writers that the jurisdiction invoked may be exercised by courts of equity, nor have we found a decided case by which it is upheld, other than two cases decided by the judges of the District Courts of the United States, sitting in equity upon the circuit, in which the jurisdiction of equity to enjoin criminal prosecutions has been pressed to great, and, as we think, unwarrantable, lengths."

The note to the case thus cited contains, as we conceive, about as fair and complete a statement in a few words as can be found, upon the then attitude of "equity" in general concerning interference by injunction with criminal prosecutions, to wit:

"It may be fairly stated that in a prosecution by the state equity has no jurisdiction to interfere, and that it will not enjoin a prosecution under a city ordinance where the ordinance is invalid, if there is any remedy by law. The exceptions to these general propositions, other than one or two doubtful cases, are, where equity has jurisdiction first, and one of the litigants tries to defeat this jurisdiction by starting a criminal prosecution involving the same parties, on account of the same subject-matter, or where there are a multiplicity of actions brought under a city ordinance solely to harass, or an effort made under a city ordinance to destroy vested franchises and affect the rights of property. But even then equity will insist on having the question tried at law, and will stay the other actions until the question is determined."

The learned author of the note cites a number of authorities to the effect that a prosecution under a city ordinance will not be enjoined; the legality of a city ordinance will not be tested by injunction where there is a

remedy by appeal; a court of equity will not restrain a criminal prosecution under a city ordinance, there being a complete remedy at law; chancery will not enjoin a prosecution under a city ordinance, no matter what may be its infirmities, where there is an adequate remedy at law; an injunction will not be granted preventing an arrest and fine for violation of a city ordinance by obstructing the streets, although complainant complained that his act was authorized by another ordinance, and insolvency of the city was alleged; an injunction will not be granted restraining a prosecution under a city ordinance against selling liquors without a license because it is claimed that the ordinance is void, and that the officer is a trespasser; a court of equity will not interfere to stay criminal proceedings under an ordinance, as such courts deal only with civil and property rights. So prosecution for failure to provide flagmen by a street railroad cable company at certain points will not be enjoined unless a multiplicity of prosecutions should be made, and then a stay of some sort might be had to test the question at law, etc. Other authorities cited illustrate the character of the property rights for the protection of which injunctions have been granted restraining prosecutions under municipal ordinances, to wit, where defendant claimed title to land that he was prosecuted for using, the prosecution was stayed until the right of possession could be determined; where it was alleged that a city was attempting by ordinance unlawfully to arrest defendant's employés and destroy its railroad franchise, etc.

From another source we take the following:

"As indicated by the historical development of the court of chancery, equity has jurisdiction generally in cases of rights recognized and protected by municipal jurisprudence where an adequate remedy cannot be had in the courts of common law. The rule is generally stated in the negative form that equity will not entertain jurisdiction where there is an adequate remedy at law." 16 Cyc. pp. 30, 31.

"The general rule is that an injunction will not be granted to stay criminal or quasi criminal proceedings, whether the prosecution be for the violation of the common law or the infraction of statutes or municipal ordinances. But, where the statute or ordinance under which the complainant is prosecuted is void or unconstitutional, and the prosecution may result in irreparable injury, an injunction will be granted to restrain the commencement or continuance of criminal proceedings under such statute or ordinance. Nevertheless, where no property rights are involved, the proceeding constitutes a mere trespass on the person, and the injunction will not be granted." 22 Cyc. 903, 904.

In note 7, 16 Cyc. 24, under the text title "Systems of Administration," it is said:

"In this note the general systems in force from time to time in each jurisdiction is indicated, but only with sufficient particularity to assist in the study of cases of different periods."

And there follow brief statements with regard to the systems of equity as administered in the different states and territories and in the courts of the United States; that is to say, whether by distinct courts, by the same courts, with distinct methods of procedure, or by the same courts, where codes or practice acts abolish the distinction in procedure.

It is hardly necessary to say that Louisiana appears in neither class, and it is not surprising to find that there are some questions of which equity takes cognizance which elsewhere are well settled in one way, and here equally well settled in the other way; as, for instance, it is well settled in the jurisprudence of this state that an injunction will not lie to prevent the bringing of civil suits, no matter how multifarious, ill founded, or related to pending litigation. It has been said by the court:

"A party cannot be enjoined from prosecuting suits for claims, whether well-founded or not. On the defense the parties can be heard and their rights adjusted. The intimation that a party fears that he may not obtain justice before a particular judicial officer, or that he should be sued in a court of higher jurisdiction, is no ground for an injunction." Butchers' B. Ass'n v. Cutler, 26 La. Ann. 500.

"The right to claim judicially what one believes he is entitled to and the right to prosecute a suit in court are rights which can be denied

to no one. They are protected by article 10 of the Constitution." Brott v. Eager, Ellerman & Co., 28 La. Ann. 262.

And the doctrine so enunciated has been affirmed in Bonin v. Monot, 28 La. Ann. 597; Hall v. Egelly, 35 La. Ann. 312; State ex rel. Sweeney v. Judge, 39 La. Ann. 619, 2 South. 385; Id., 40 La. Ann. 1, 3 South. 460; Otis v. Sweeney, 48 La. Ann. 942, 20 South. 229; Lewis v. D'Albor, 116 La. 679, 41 South. 31.

In the matter of the issuance of injunction to stay prosecutions for offenses or quasi offenses against municipal ordinances, the jurisprudence of this court is fairly represented by its rulings in the following cases (the case first below mentioned, though a civil suit, to recover a penalty prescribed by an ordinance, being considered relevant to the issue here presented), to wit:

In Devron v. First Municipality, 4 La. Ann. 11, Eustis, C. J., as the organ of the court, said:

"This is an appeal taken by the plaintiff from a decree of the First district court * * * dissolving an injunction which had been granted by the judge * * * prohibiting the institution of suits against the plaintiff for contravention of a certain ordinance * * * prohibiting the sale of groceries in the vegetable market, etc. This injunction has been granted in a suit instituted by the plaintiff against the municipality for the purpose of testing the validity of said ordinance, and to recover the sum of $500 damages by reason of the interference of said municipality with the business of the plaintiff as a grocer in said market. The plaintiff can test the legality of the ordinance by direct appeal from the decision of the justices of the peace to this court, and the jurisdiction of the justices of the peace, we think, ought not to have been interfered with by prohibiting the institution of suits, on the showing of the plaintiff made out in his petition. As we think the injunction ought not to have issued, we do not find the court erred in dissolving it."

In Levy & Co. v. Shreveport, 27 La. Ann. 620, plaintiffs alleged that they were conducting a private market, under a state license, and that a city license had been refused; that the mayor on divers occasions, had caused them to be arrested and had fined them; that they had appealed from his judgments, but that he continued to have them arrested daily, and had declared that he would fine them for each day that they continued in business; that they were in the exercise of a legal right; and that the mayor was without jurisdiction in the premises. Wherefore they prayed for an injunction, which was granted and perpetuated in the district court. On the appeal it was held by this court that plaintiff could not test the legality of the ordinance or the authority of the mayor to enforce it by injunction, but should have appealed from the judgments imposing the penalty prescribed by the ordinance.

In Hottinger v. City of New Orleans, 42 La. Ann. 629, 8 South. 575, plaintiff sought to enjoin the city from proceeding to enforce an ordinance requiring the removal of dairies from within certain limits, alleging that she had been established where she then was for many years; that she owned the land, worth $4,000, a stable, worth $600, and cows and horses and carts, worth $700.

"She alleges," said the court, "that the ordinance is unconstitutional, * * * and, relying upon the value of her property stated in her petition which she employs in her business, she sought the jurisdiction of the civil district court. An exception to the jurisdiction of the * * * court was filed by the city, which was maintained, and from which judgment the plaintiff has appealed. The ordinance was enacted in pursuance of the police power vested in the city; whether rightfully or wrongfully is not to be determined in this suit. It was a police regulation, in the interest of public health, with a penalty for its violation. The pecuniary loss in the enforcement of the ordinance cannot, therefore, be considered in determining the question of jurisdiction. The enforcement of the ordinance rested by the Constitution and law of the state upon the recorder's court of the city of New Orleans. If the ordinance is unconstitutional, as alleged, the plaintiff can suffer no injury, as she has her remedy, and can urge her defense in the recorder's court. Failing there, she has her remedy by appeal to this court. * * * The courts of this state have no power to issue an injunction to prevent a municipal corporation from enforcing, by authorized judicial process, its police ordinances, penal in their nature, enacted for the preservation of the public health, on a doubtful and vague charge of unconstitutionality."

In State ex rel. City v. Judge, 48 La. Ann. 1448, 21 South. 28, a certain association obtained an injunction forbidding the mayor and police of the city, acting under a statute known as the "Sunday Law," from interfering with the sale at a Sunday festival of beer and other refreshments, and, those officers having been ruled into court for contempt in violating the injunction, obtained a writ of certiorari from this court, by virtue of which the proceeding against them was brought up for review. It was here said:

"Act No. 18 of 1886 is a criminal statute. The duty was imposed upon relator to see that the statute was executed. It was their duty to arrest all offenders against that statute. No court has the power by injunction to restrain the execution of a criminal statute. But the respondent judge says the law does not apply to the plaintiff in injunction. This is placing an interpretation upon a criminal statute that is within the jurisdiction of the criminal court."

In Lecourt v. Superintendent of Police et al., 49 La. Ann. 487, 21 South. 646 (a case similar to that last above cited, save that it came up on an appeal from the refusal of the district court to grant the injunction prayed for), the language above quoted was used in assigning reasons for affirming the judgment appealed from.

In L'Hote v. City of New Orleans, 51 La. Ann. 93, 24 South. 608, 44 L. R. A. 90, it appeared that plaintiff, finding that the city council had adopted an ordinance changing the boundaries of the district to which houses of ill repute had theretofore been confined, and that his residence was included within the limits of the new district so created, brought suit, attacking the ordinance as invalid, and enjoining its enforcement until his rights could be ascertained. It does not appear that he was threatened with any prosecution or penalty, or that he was likely to be. What he complained of was that the ordinance would operate to destroy the value of his property and was unauthorized. It was said by this court:

"It is clear that the civil district court has no jurisdiction to restrain prosecutions for crime confided by the law to the criminal courts. No prevention of such prosecutions is attempted. The plaintiff seeks the injunction for the protection of his rights of property, menaced, as he conceives, by an illegal ordinance. The right of the citizen to that protection is too clear to permit dispute, and, in our view, the petition contains all that is essential to secure relief at our hands, if the allegations in the petition are supported."

On the merits of the case, however, the court found that it was within the police power of the city to enact the ordinance, and the suit was dismissed.

In McFarlain v. Town of Jennings, 106 La. 545, 31 South. 62, the plaintiff complained that an ordinance had been adopted purporting to authorize the impounding of stray cattle, under which his cows had been impounded and were about to be sold, but that Jennings was not a town of 2,000 inhabitants, and, under the law, was unauthorized to adopt such an ordinance. He enjoined the sale of his cows, the injunction was made perpetual by the judgment of the trial court, and that judgment was affirmed on the appeal.

In Boin v. Town of Jennings, 107 La. 410, 31 South. 866, it appeared that plaintiff obtained an injunction restraining the defendant town from interfering with him in the conduct of a barroom. There was an exception of no cause or right of action and an answer in which it was alleged that the injunction had been obtained in order to obstruct the enforcement of a valid ordinance and to enable plaintiff to conduct an illegal business. On the trial of the case the injunction was dissolved, and plaintiff appealed.

In this court it was said:

"Upon the facts thus presented, we are of opinion that the district court properly declined jurisdiction to maintain the injunction, since, it appearing that the effect of the injunction was to prohibit the enforcement of an ordinance in the nature of a police regulation, the question of the legality or constitutionality of such ordinance, whether as to all of its provisions or in part,

should be left to the court in which the attempt is made to enforce it, a remedy by appeal to this court being open in such cases to the party as against whom the attempt is made. City v. Becker, 31 La. Ann. 644; Holtinger v. City, 42 La. Ann. 629 [8 South. 575]; Darcentel v. Slaughterhouse Co., 44 La. Ann. 632 [11 South. 239]; Lecourt v. Superintendent, 49 La. Ann. 488 [21 South. 646]; State v. Crozier, 50 La. Ann. 247 [23 South. 288]."

In New Orleans Baseball & A. Co. v. City of New Orleans, 118 La. 228, 42 South. 784, 7 L. R. A. (N. S.) 1014, 118 Am. St. Rep. 366, 10 Ann. Cas. 757, it appeared that plaintiff had paid $40,000 for a square of ground for the purpose of establishing a baseball park; that the city council several weeks later adopted an ordinance prohibiting such parks within a certain territory, which included the square in question; that plaintiff thereupon prayed that the enforcement of the ordinance be prohibited, on the grounds that it was oppressive, discriminatory, and illegal; and defendant was ordered to show cause why the injunction should not be granted. On the hearing of the rule it appears to have been admitted that there were several baseball parks within the territory prescribed by the ordinance, which had been there for 25 years, and the injunction was issued, and thereupon the matter was brought to this court upon application for prohibition, which, after hearing, was denied; the exercise of jurisdiction by the district court being affirmed.

In Louisiana Oyster & Fish Co. v. Police Jury, 126 La. 522, 52 South. 685, plaintiff, who was engaged in catching fish for the market, applied to the judge of the district court for an injunction restraining the enforcement of an ordinance of the police jury of Assumption parish making it an offense to fish with a seine more than 50 feet long. The judge refused to issue the writ, and plaintiff appealed to this court, which adopted the reasons of the judge and affirmed his judgment. The main reason assigned was that plaintiffs' allegation that it contemplated fishing in the waters of Assumption parish disclosed no vested or property rights which called for the issuance of the injunction, inasmuch as those waters are among the things that are public and are under the administration of the police jury, for the benefit of the public.

It will be seen from the foregoing that elsewhere "equity" will not entertain jurisdiction where there is an adequate remedy at law; that "the general rule is that an injunction will not be granted to stay criminal proceedings, whether the prosecution be for the violation of the common law or the infraction of statutes or municipal ordinances"; and that an exception to that rule is made "where the statute [in some jurisdictions] or ordinance under which the complainant is prosecuted is void or unconstitutional, and the prosecution may result in irreparable injury to his property rights."

It will further be seen that in Louisiana it is settled doctrine that no one can be denied the right to bring a civil action, because the Constitution secures that right, and the law provides the means of defense in the court in which the action is brought, which is held to be an adequate remedy for the defendant; that up to 1899 the same rule had been applied to criminal prosecutions, i. e., that the opportunities and means of defense which the law provides in such cases to be used in the courts, which alone are vested with jurisdiction to interpret and apply the law for the purposes of such prosecutions, constituted an adequate remedy for the defendant, and that a court not possessing that jurisdiction would not assume to interfere with its exercise; that in the year above mentioned, however, a case arose of an ordinance defining the boundaries of a certain district in the city of New Orleans which, in the undoubted exercise of the police power, was subjected to a particular police control, and which for the first time included the property of the citizen who complained. His complaint was that the

ordinance destroyed the value of his property, and was unconstitutional for that reason, and not because of its penalties, which (as we understand) were directed, not against him, but against those who might choose to inhabit the district. His case was therefore a typical one, in the respect that the ordinance was alleged to be illegal and to operate an invasion of his rights, and, as he was not to be prosecuted under it, his only remedy was to attack it in a court of civil jurisdiction, and part of that remedy was the injunction which stayed the destruction, in character and value, of his property, until the case could be decided. The doubtful point (if it can be called doubtful) was that the ordinance (as this court held in its decision) was not illegal, but was within the police power of the city, and hence there was lacking one of the elements necessary to confer jurisdiction (not to hear and decide the complaint against the validity of the ordinance, but) to issue the injunction; for in such case the authority conferred by the Code of Practice (article 303) to issue an injunction "to prevent one of the parties, during the continuance of the suit, from dilapidating the same [property in dispute], or from doing some other act injurious to the other party," confers no authority to enjoin a municipality from prosecuting for violations of one of its ordinances, save in the excepted case, where there is an actual or threatened invasion of property rights, no adequate remedy at law, and the ordinance is (and not merely alleged to be) illegal. A similar condition would be presented if one of the divisions of the civil district court should enjoin the execution of a judgment rendered by another division, or by the criminal district court, or by this court, upon unfounded allegations and a mistaken exercise of discretion; for in such case the fact that the injunction was so issued would not supply the required jurisdiction any more than it would purge the writ of its nullity. In McFarlain v. Jennings and Baseball Ass'n v. City the ordinances were plainly illegal and plainly invaded a right of property, and the court was presumably of opinion that the remedy, by defense in the mayor's or recorder's court, was inadequate.

In the case now under consideration the petition contains no allegation whatever that plaintiffs own any property, or that any property of theirs is to be affected. Le Blanc makes affidavit:

That the allegations of the petition "are true and correct, except those made on information and belief, and that petitioner believes them to be true, and that a writ of injunction is necessary to protect him in the premises."

Geerken's affidavit reads:

"That he is the petitioner named in the foregoing petition, that his property for the operation of his business is worth more than $2,000, and the enforcement of section 2 of the ordinance will prevent him from doing business, and that the injury will be irreparable."

It is not stated that the property mentioned will be rendered less valuable by reason of the ordinance, nor is the business mentioned in the affidavit connected, save by a possible inference, with that mentioned in the petition.

Taking the petition and affidavit together, and giving them a liberal construction, the case stated by them is that petitioners are engaged in the business of carrying passengers for fares in "jitneys" through the streets of New Orleans; that they fall within the terms of section 2 of the ordinance which they attack; that the section is unconstitutional and illegal, and imposes oppressive, discriminatory, and confiscatory conditions, with which they are unable to comply; that they are therefore unable to conduct their business under it.

They also allege that the city of New Orleans is unable to respond in damages, and that a judgment against it cannot be executed, or at least not for years to come. Wherefore they pray for the injunction.

[3, 4] The streets of the cities and towns in

Louisiana being among the things that are "public" and "for the common use," no individual can have a property right in such use for the purposes of his private business, unless, speaking generally, that business being in the nature of a public service or convenience, such as would authorize the grant, the right has been granted by the state, which alone has the power to make or authorize it, or, by the particular city or town, acting under the authority of the state, and in such case the right can be exercised only in accordance with the conditions of the grant; that is to say, an individual seeking, but not possessing, a right of that kind, may accept the grant, with the conditions imposed by the offer, in which case he becomes bound by the conditions, or he may refuse to accept the conditions, in which case there is no grant, and without the grant so offered, or some other, from the authority competent to make it, he can never acquire the right to make use of a street as his place of business. What he may do, if anything, in the way of litigation, to compel the municipality or the state to make him a grant that will be satisfactory to him, is apart from this immediate inquiry. So far as the city of New Orleans is concerned, the lawmakers have specified, in sections 28 and 29 of its charter, the kinds of business for the purposes of which the use of the streets may be granted and the method and conditions by and upon which the grants may be made, and plaintiffs do not allege that the business in which they are engaged is included among those so specified, or that the right which they assert was granted in the manner and upon the conditions so prescribed, or in any other manner or upon any other conditions. To the contrary, their allegations are that, without any grant, they have the right to the use of the streets for the transaction of their business, and that the city has interfered with its exercise by adopting an ordinance regulating the use of the streets for that purpose, and imposing conditions which are arbitrary and unreasonable and with which they are unable to comply, that the ordinance carries a penalty, for the enforcement of which they are prosecuted and threatened with prosecution in the recorders' courts, and that they are thus prevented from carrying on their business; and the relief that they ask is that the city be perpetually enjoined from enforcing its ordinance, which means that the court shall confer upon them, or recognize in them, the right, which neither the state nor the city has conferred or recognized, to make use of the streets as their place of business, free of the conditions imposed by the city, or any other conditions save those (presumably) to which all persons are subjected who conduct their businesses on private property and make only that incidental and ordinary use of the streets required in such cases. But the allegation of "right" so made is merely the statement of an erroneous conclusion of law; for neither the Constitution nor the law confer such right, but, on the other hand, vest the power to regulate the use of the streets for the common benefit in the electors of New Orleans and the public officers chosen by them, and, if that power were not so vested somewhere, every one would have the same right that plaintiffs assert, since the use of the streets, whatever may be the method, is common to all, and, the power of the sovereign being ignored, every one would be entitled to make such use as those who are the stronger might permit, and the mass of the inhabitants might find it difficult and dangerous to obtain that use for which alone their property is expropriated in order that streets may be constructed, and their money expended in order that they may be maintained and beautified. It is not denied, however, that the power to administer the streets for the benefit of the public is in the state, or that the state may delegate the power to its municipalities, re-

spectively, or that it has delegated it, in terms both comprehensive and specific, to the city of New Orleans; and, as the existence and exercise of the right here asserted by plaintiffs would be irreconcilable with the existence and exercise of the power so delegated, we are of opinion that the right does not exist, and that plaintiffs allege no such invasion of a property right and disclose no such interest in the operation of the ordinance here in question as to give them a standing in court for the purposes of this suit. Hence it is immaterial for those purposes whether the law, as administered in the courts vested with jurisdiction (original and appellate) with respect to prosecutions under the ordinance in question, provides an adequate remedy for the protection of such interest, or whether the ordinance be valid or invalid; and hence, also, the civil district court was without jurisdiction to grant the injunction.

The Court of Civil Appeals of the Fourth Supreme Judicial District of Texas, through Chief Justice Fly, has recently handed down an opinion in the matter of R. P. Greene, Appellant, v. City of San Antonio et al., Appellees (Tex. Civ. App.) 178 S. W. 6, in which the question of the relation of the business of operating "jitneys" in the city of San Antonio to an ordinance similar (as we infer) to that here in question is ably considered, to the same conclusion as that above stated. The learned Chief Justice says (inter alia):

"No man has the right to use a street for the prosecution of his private business, and his use for that purpose may be prohibited or regulated, as the state or municipality may deem best for the public good. * * * In the case of Fifth Avenue Coach Co. v. City of New York, 194 N. Y. 19 [86 N. E. 824, 21 L. R. A. (N. S.) 744, 16 Ann. Cas. 695], it was held that the right to run coaches on Fifth avenue was a franchise, and, further, that the city had the authority to grant or withhold the right to run coaches on the streets. The decisions in Hatfield v. Straus, 189 N. Y. 208 [82 N. E. 172], State v. St. Louis [161 Mo. 371] 61 S. W. 658, and People v. Clean Street Co. [225 Ill. 470] 80 N. E. 298

[9 L. R. A. (N. S.) 455, 116 Am. St. Rep. 156], condemn conducting private business in the street, even where expressly authorized by the municipality, unless there is some corresponding benefit to the public.

"In the case of Van Norder v. Sewer, Water and Street Commissioners [90 App. Div. 555] 86 N. Y. Supp. 445, it has held that an ordinance which prohibited a hackman from allowing any horse or vehicle to stand in any public street of the village for hire, or to walk or drive through the street soliciting, was valid."

The opinion then cites the case of Wade v. Nunnelly, 19 Tex. Civ. App. 255, 46 S. W. 668, in which the court, sustaining an ordinance prohibiting the sale of country produce on the street, held that the appellees had no vested right to make marts of the streets, and to deny them the privilege of so doing was not to destroy or deteriorate any of their property rights, and (the opinion) proceeds:

"So in this case appellant has never had any vested right to use the streets of San Antonio to engage in the business of a common carrier of passengers for hire, and no right of his is infringed or invaded by the ordinance requiring certain things to be done in order to enter into business on the streets, which have, at the expenditure of large sums, been placed by the city in prime condition for automobile travel. The streets belong to the public, the city being its trustee, and no private individual or corporation has a right to use such streets for the prosecution of a business without the consent of the trustee and a compliance with the conditions upon which the permission to so use them is given."

We cite the foregoing in support of the proposition that, whether the ordinance which the plaintiffs herein have attacked be legal or illegal, they have disclosed no property right which it invades.

For the reasons thus assigned, it is ordered and decreed that the writ of prohibition herein prayed for be granted, that the respondent judge be prohibited from further enforcing the writ of injunction herein granted by him, and that the plaintiffs, herein made respondents, pay all costs.